NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LESLIE SOLIS, | : | |
| | : | |
| Plaintiff, | : | Hon. Dennis M. Cavanaugh |
| | : | |
| v. | : | **OPINION** |
| | : | |
| | : | Civil Action No: 09-2032 (DMC) |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

This matter comes before the Court upon the appeal of Sandra Perdomo ("Perdomo") on behalf of her minor child Leslie Solis ("Leslie" or "Plaintiff") from the final decision of the Commissioner of Social Security ("Commissioner"), denying Plaintiff's claims for child Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"). This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1383(c)(3). No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.

As detailed below, the final decision entered by Administrative Law Judge ("ALJ"), Richard L. De Steno, is **affirmed** in part and **remanded** in part.

# I.  BACKGROUND

## A.  PROCEDURAL HISTORY

On October 28, 2004, Ms. Perdomo filed an application on Leslie's behalf for SSI, alleging disability beginning September 1, 2002.  (Administrative Transcript ( "Tr.") at 103).  Plaintiff's claim was  initially denied on August 31, 2005 (Tr. at 45-47), and again upon reconsideration on June 1, 2006. (Tr. at 52-55).  Thereafter, Plaintiff filed a timely written request for a hearing before an ALJ on June 29, 2006. (Tr. at 56-57).  On March 25, 2008, a hearing was held before the Honorable Richard L. De Sterno, ALJ (Tr. at 27), and on May 30, 2008 the ALJ denied Plaintiff's claims. (Tr. at 27-41).  Plaintiff sought review of the decision, but the Appeals Council denied her request on December 24, 2008. (Tr. at 7-11).  On May 12, 2009, Plaintiff filed a timely complaint with this Court seeking judicial review.

## B.  FACTUAL HISTORY

### 1. The Findings of the Administrative Law Judge

ALJ De Sterno made the following six findings regarding Plaintiff's application for SSI: (1) the claimant was born on April 8, 1998.  Therefore, she was a preschooler on October 28, 2004, the date the application was filed, and is currently a school-aged child; (2) the claimant has not engaged in substantial gainful activity at any time relevant to this decision; (3) the claimant has severe impairments involving an attention deficit hyperactivity disorder ("ADHD"); (4) the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 ("listings"); (5) the claimant does not have an impairment or combination of impairments that functionally equals the listings; and (6) the claimant has not been disabled, as defined in the SSA, since October 28, 2004, the date the

2

application was filed.  (Tr. at 30-41).

## 2. Plaintiff's Medical History and Evidence

Plaintiff alleges that she has been disabled since September 1, 2002, as a result of suffering from ADHD and associated learning and behavioral disabilities.  Plaintiff's medical history and the evidence pertaining to her impairments are summarized below.

### i. General Medical History

Leslie's medical records show that she has had no prior hospitalizations or chronic illnesses; however, Ms. Perdomo reports that Leslie suffers frequently from common childhood ailments.  (Tr. at 201, 448-50).   Conflicting reports make it difficult to ascertain whether Leslie was developmentally delayed in her infant and toddler years.  Early psychiatric reports and educational evaluations show that Leslie reached developmental milestones within the average range as an infant and toddler.  (Tr. at 185, 255).  In a 2005 psychiatric report, Dr. Jan S. Cavanaugh ("Dr. Cavanaugh") reported Leslie's infancy and toddler development to be within the average range based on the fact that she sat at twelve (12) months, stood at sixteen (16) months, walked at two (2) years, said her first words at eighteen (18) months, and was toilet trained at thirty (30) months.  (Tr. at 255). In contrast, a University of Medicine and Dentistry of New Jersey ("UMDNJ") Crisis Clinic 2007 report notes speech, walking, and toilet training delays.  (Tr. at 410).

According to Ms. Perdomo, Leslie  began exhibiting speech and cognitive delays when she was three years old.  (Tr. at 201).  At the date of the alleged disability onset (as reported in Leslie's SSI application), Leslie was four years and five months of age.  (Tr. at 103).  Leslie was diagnosed with ADHD on July 7, 2004 by Dr. E. C. Gaudenror, a psychiatrist at SERV Behavioral System, Inc., after Ms. Perdomo reported concerns about Leslie's speech delays, inattention, and hyperactivity.

(Tr. at 304-12).  Leslie was prescribed ten (10) milligrams ("mg") of Ritalin, a rapid-release prescription drug used to control common ADHD symptoms, twice daily.  Id. at 312, 355.  On October 20, 2005, Dr. Caroline Hayes-Rosen, a medical doctor at the UMDNJ, prescribed twenty-seven (27) mg of Concerta, an alternative extended release prescription ADHD medication, in lieu of Ritalin to control Leslie's ADHD symptoms more effectively.  (Tr. at 234).

### ii. Psychiatric History

Leslie has no history of psychiatric hospitalizations or outpatient psychiatric treatment.  (Tr. at 254).  Her family has no history of psychiatric or cognitive problems, and there is no family history of drug/alcohol, physical, sexual or emotional abuse.  (Tr. at 255).  Leslie was first psychologically examined by Dr. E.C. Gauderer on July 7, 2004.  (Tr. at 309).  Dr. Gauderer reported that Leslie was a "pleasant, cooperative, and outgoing" child with no issues regarding hygiene or appearance.  (Tr. at 311).  Dr. Gauderer assessed Leslie's mood and cognition as normal, reported that her thought processes and content were intact, and indicated that she did not have delusions, hallucinations, or suicidal impulses.  Id.  Leslie exhibited "OK" recent and remote memory, "OK" cognitive abstraction abilities, and age-appropriate insight.  Id.  Dr. Gauderer's clinical impression was that Ms. Perdomo was "overwhelmed by the complexities of the medical/developmental/learning issues of her three children," and recommended special education classes for Leslie.  Id.  Dr. Gauderer diagnosed Leslie with Axis I learning disabilities with associated ADHD and assessed her a global functioning[1] ("GAF") at 65, indicating that Leslie was

---

[1]According to the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition, the GAF scale measures a patient's overall psychological, social, and occupational functioning on a hypothetical continuum.  For example, a score falling within the range of 61-70 indicates that the patient shows "some mild symptoms or some difficulty in social, occupational, or school functioning, but is generally functioning pretty well, and has some meaningful relationships."

4

"generally functioning pretty well." (Tr. at 312).  Dr. Gauderer prescribed Ritalin and recommended that Leslie start psychotherapy.  Id.

On November 16, 2004, Leslie was referred to Pediatric Neurologist  Dr. Sue X. Ming for further psychological evaluation and management of her ADHD symptoms and associated behavioral problems.  (Tr. at 201).  Dr. Ming noted that Leslie showed some improvement in her hyperactivity after taking Ritalin for nine months.  Id.  A physical examination indicated that Leslie's motor strength, cranial nerves, and sensory functions were normal.  Id. at 202.  Dr. Ming determined that Leslie should continue the Ritalin treatments and speech and behavioral therapy.  Id.  Subsequent physical and psychological examinations conducted on April 11 and 15, 2005 at the North Hudson Community Action Corporation Health Center ruled out mental retardation and ADHD, but noted that Leslie's developmental delays were under continued investigation.  (Tr. at 251-53).

On December 19, 2005, Leslie saw Dr. Cavanaugh for consultative psychiatric and intelligence evaluations. (Tr. at 254-58, 259-63).  Leslie was on medication during the examinations. (Tr. at 275).  At the time, Leslie was seven years eight months of age.  (Tr. at 254).  The psychiatric evaluation revealed that: Leslie's speech was not age appropriate; her thought processes were often incoherent; her attention and concentration were severely impaired due to her hyper nature; her recent and remote memory skills were severely impaired due to her inability to focus; and her judgement and insight were poor.  (Tr. at 256).  Intelligence testing revealed a standardized intelligence quotient ("IQ") of 53, which indicated that Leslie was functioning in the mild mental retardation range.  (Tr. at 262).  Administration of a standardized achievement test (WRAT-III)

American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed., text rev. 2000).

showed that Leslie was reading at a pre-school age level.  Id.  Dr. Cavanaugh felt that Leslie's demeanor and responses were suspicious, however, because her manner of relating, social skills, and overall presentation fluctuated between that of a four year old and that of an adult.  (Tr. at 255).  Dr. Cavanaugh noted several contradictions in Leslie's affect and abilities, but nevertheless diagnosed her with ADHD, cognitive disorder (not otherwise specified) and mild mental retardation.  She also recommended that Leslie's intelligence quotient (IQ) be retested in the future, "when Leslie is more psychologically stable."  (Tr. at 257).

On March 31, 2006, Dr. M. C. Morog evaluated Leslie's functional cognitive and behavioral abilities.  (Tr. at 276).   Dr. Morog expressed concern about the discrepancies between Dr. Cavanaugh's report and Ms. Perdomo's testimony about Leslie's functional abilities and behavior in school.  (Tr. at 275).  Dr. Morog concluded that Dr. Cavanaugh's findings were not credible because: testing conditions were not optimal, as Leslie's four siblings' "significant behavioral discontrol" was distracting; Dr. Cavanaugh's impression was that Leslie was "a great deal more functional than she presented"; and the behaviors witnessed by Dr. Cavanaugh were not observed or reported in any other setting.  (Tr. at 275).  Dr. Morog concluded that Leslie's impairment was severe, but did not meet, medically equal, or functionally equal the listings based on Leslie's documented ability to function "quite well" in school, Leslie's "contradictory and confusing" behavior, and limitation domains assessing Leslie's functional equivalence.  (Tr. at 275-78).  In the "Acquiring and Using Information" domain, Dr. Morag found a marked limitation because Leslie had obtained scores within the range of mental retardation in Dr. Cavanaugh's exam.  (Tr. at 278).  However, Dr. Morag noted the discrepancies between Leslie's behavior with Dr. Cavanaugh and her behavior observed in the classroom setting.  Id.  As to "Attending and Completing Tasks," Dr.

6

Morag found a less than marked limitation, as teacher reports indicated that Leslie concentrates better and stays on task while on medicine. Id. Dr. Morag found no limitations in the "Interacting and Relating with Others," "Moving About and Manipulating Objects," "Caring For Yourself," and "Heath and Physical Well-Being" domains. (Tr. at 278-79).

Leslie was re-evaluated at the FP-Pain Management Center at DOC ("Center") on February 20, 2007. (Tr. at 421). Leslie was seen by Dr. Caroline D. Hayes-Rosen, who noted that Leslie was at the time taking Ritalin, despite the fact that she had prescribed Concerta, a more effective drug for Leslie, in 2005. Id. Dr. Hayes-Rosen re-prescribed Concerta and urged Ms. Perdomo to replace Leslie's glasses, which had been broken for over a year. Id. One month later, Leslie was evaluated at the Center by Dr. Syed A. Hosain, who noted a teacher's report that showed Leslie as doing better on Concerta, "but could still have some more help with concentration." (Tr. at 424). A follow-up visit to Dr. Hosain on May 1, 2007 showed no changes in Leslie's school behavior and achievement and noted that "patient can not read simple sent[e]nces." (Tr. at 427-28). On a July 17, 2007 visit to Dr. Sue X. Ming at the Center, Ms. Perdomo reported that Concerta was helpful and that Leslie was paying more attention and was less distractable "but she is still hyper and still can not read." (Tr. at 430). Dr. Ming reported that Leslie was "doing okay" on Concerta, although her symptoms were still not controlled. (Tr. at 431). A follow-up examination at the Center performed by Dr. Hayes-Rosen on April 1, 2008 showed that Leslie was still having problems with sleeping, paying attention in class, and writing certain letters, despite the fact that she was "doing better at school." The report also notes that Leslie "still cannot read." (Tr. at 433).

In addition to treatment at the Center, Leslie was referred to the UMDNJ Behavior HealthCare center for analysis and treatment of her behavioral problems, learning disabilities,

hyperactivity, impulsivity, and sleep disturbances.  (Tr. at 409).  Dr. Evan Christodoulou evaluated Leslie on January 23, 2008 and reported that Leslie was independent in terms of personal appearance, safety, and prevention.  (Tr. at 411).  He noted that Leslie's strengths included an ability to listen to and trust others, and to maintain age-appropriate hygiene.  Id.  Barriers to treatment included a lack of motivation, learning disabilities, and volatile emotions, as evidenced by Leslie's low frustration tolerance.  (Tr. at 412-13).  Dr. Christodoulou diagnosed Leslie with ADHD combined type, and recommended further evaluation, individual therapy, behavior modification, support, and psycho-education in an outpatient setting.  (Tr. at 12).

### iii. Educational Evaluations

Leslie qualified for special education services in July 2004 after her kindergarten teacher referred her to the school's Child Study Team ("CST") for evaluation due to difficulties in Reading, Mathematics, and Writing.  (Tr. at 187).  The CST employed several evaluative approaches to assess Leslie's academic functioning and related needs, including the Woodcock Johnson III ("WJ-III"), the Brigance Comprehensive Inventory of Basic Skills ("BCIBS"), a cumulative file review, and teacher report analyses.  (Tr. at 188).  WJ-III results showed that Leslie's basic reading skills were in the low to low average range, her academic knowledge standard score was within the very low range, her academic skills and writing ability were limited, her quantitative reasoning were limited to average, and her comprehension ability was very limited.  (Tr. at 189).  BCIBS results showed similar struggles with counting, alphabet recitation, and language processing.  (Tr. at 190-91).

A 2004-2005 school year Individual Education Program ("IEP") Eligibility Determination Report noted Leslie's Spanish language dominance, but found that her Spanish proficiency was disordered.  (Tr. at 167).  Leslie's academic achievement was reported as being in the very low

range, and her ability to apply her academic skills was within the low average range.  Id.
Additionally, Leslie exhibited low level basic reading skills and her cognitive functioning was within
the low average to average range.  Id.  Finding that Leslie's impairments went beyond that which
could be realistically addressed in a regular education class, Leslie's IEP team recommended that
Leslie enroll in Jean Labriola's special education classroom for core classes.  (Tr. at 177).  At the
conclusion of the 2004-2005 school year, Ms. Labriola indicated in a teacher questionnaire that
Leslie had a slight to obvious problem with acquiring and using information; no problem to a slight
problem with attending and completing tasks, caring for herself, and interacting and relating with
others; and no problem with moving about and manipulating objects. (Tr. at 205-211).

  Leslie's IEP was re-evaluated on June 17, 2005 for the 2005-2006 school year.  (Tr. at 212).
The IEP team found that Leslie's educational performance had improved over the course of the
2004-2005 school year  in her special education classes.  (Tr. at 214).  The team noted that Leslie
"is a sweet girl who interacts nicely with her classmates.  She likes to assist the teacher in various
classroom activities . . . and has no behavior concerns at school."  Id.  Despite this positive
improvement, Ms. Perdomo continued complaining about Leslie's hyperactivity and retention
difficulties at home.  Id.  The IEP team discussed general education classes as a primary placement
option; however, Leslie's needs were deemed to be better met in the special education setting.  (Tr.
at 223). Ms. Labriola's January 10, 2006 questionnaire shows that Leslie continued to exhibit slight
to obvious problems with acquiring and using information and attending and completing tasks[2] in
the 2005-2006 school year, but that she had no problem with interacting and relating with others,

_____

  [2]Ms. Labriola noted that Leslie had a serious problem with carrying out multi-step
instructions.

moving about and manipulating objects, or caring for herself.  (Tr. at 264-269).

Leslie's 2006-2007 IEP is not included in the record; however, it appears that she was enrolled in the special education program that school year.  (Tr. at 315).  On April 16, 2007, Leslie was administered the Wechsler Individual Achievement Test ("WIAT-II") as part of a triennial review of her IEP.  (Tr. at 344-347).  Leslie demonstrated extremely low to low performance in all areas tested; her case worker, Mary V. Maulbeck, observed that Leslie "presented as a quite disinterested youngster when she came for testing."  (Tr. at 344-45).  Ms. Maulbeck commented that Leslie's considerable lack of interest could have negatively impacted her scores.  (Tr. at 347).  On May 15, 2007, School Psychologist Susan Schemly measured Leslie's IQ with the Wechsler Intelligence Scale for Children-Fourth Edition ("WISC-IV") (Tr. at 340-343).  Leslie received a score of 70 on the WISC-IV, which placed her in the second percentile compared to other girls her age and in the borderline range of intellectual functioning.  (Tr. at 341).  However, Ms. Schemly noted that because of Leslie's apathetic affect and lack of focus, she did not consider the results of the WISC-IV to be a valid representation of Leslie's cognitive abilities.  Id.

On May 7 and 23, 2007, the CST requested a Speech and Language assessment to ascertain Leslie's difficulties with grammar and vocabulary.  (Tr. at 398).  Jeanet Sabota, a Speech Language Specialist, commented that Leslie was very cooperative throughout the evaluation process and was a "pleasure to work with."  (Tr. at 401).  An informal language sample revealed that Leslie presents with age appropriate articulation and rate of speaking skills.  (Tr. at 398).  Classroom observation and teacher input revealed that Leslie is able to stay focused if she is interested in what she is doing.  (Tr. at 399).  Ms. Sabota administered three tests to gauge Leslie's speech and language skills.  (Tr. at 401).  Results from those tests revealed that Leslie's speech and language skills fall in the very

low average range.  Id.

Leslie's IEP was re-evaluated for the 2007-2008 school year on November 6, 2007.  (Tr. at 364).  Based on a combination of her standardized psychological evaluation results, academic deficiencies, and behavioral deficits, the IEP team determined that Leslie should remain in the special education program.  (Tr. at 376).  The IEP team's comments indicate that Leslie was slowly making progress in reading, sight words, letter identification, spelling, addition, subtraction, writing in cursive, following rules, cooperating, vocabulary, and motor planning skills.  (Tr. at 367).  Despite such progress, in the 2007-2008 school year, Leslie was still not exhibiting age appropriate academic, motor, or behavioral skills.  Id.  She continued to "demonstrate[] significant weaknesses in reading, written language, math, and oral communication."  (Tr. at 376).

### 3.  Sandra Perdomo's (Plaintiff's Mother) Testimony

Ms. Perdomo testified on behalf of Leslie, then nine years old, at the ALJ hearing held on March 25, 2008.  (Tr. at 438-58).  Leslie shares an apartment with her mother and four siblings, all of whom are diagnosed with ADHD.  (Tr. at 417, 442).  Ms. Perdomo describes Leslie as being hyperactive and a slow learner.  (Tr. at 441, 447).  Leslie currently takes Concerta to control the symptoms of her ADHD.  (Tr. at 447).  Ms. Perdomo testified that Leslie is able to focus with the medication, but that its effects wear off by the time she comes home from school.  Id. at 447-48.

With regard to Leslie's abilities, Ms. Perdomo testified that she believes her daughter is disabled because Leslie "does not act like the rest of the children."  (Tr. at 440).  Ms. Perdomo reports that Leslie attained developmental milestones late for her age, and shows concern about her daughter's inability to read at an appropriate age level, noting that it is "not normal for a 10-year-old girl who is in fourth grade, that [is] going to middle school next year . . . not [to be] able to read."

11

 (Tr. at 441).  In terms of speaking ability, Ms. Perdomo has noticed that Leslie does not "know how to express herself," despite the fact that Leslie speaks perfect English and Spanish.  (Tr. at 445, 450). Additionally, Leslie likes math, but can only perform calculations that require simple addition and subtraction skills.  (Tr. at 453).  Leslie is able to use the bathroom by herself, dress herself, feed herself, get to school without her mother's help, take a shower on her own, and is able to complete homework assignments with supervision.  (Tr. at 444-45).  Leslie  likes to exercise, and is able to run, ride a two wheeled bicycle, and participate in ball games.  (Tr. 446)

When asked if Leslie exhibited behavioral problems in addition to her academic impairments, Ms. Perdomo stated that Leslie is "always in constant movement," and cannot focus properly on her schoolwork.  (Tr. at 441-42).  Ms. Perdomo shared that Leslie has problems sleeping, and often wakes up in the middle of the night wanting to watch television; however, Leslie's neurologist reassured Ms. Perdomo that such sleeping patterns are normal and probably the effects of the Concerta.  (Tr. at 449-50).  With regard to Leslie's temperament, Ms. Perdomo describes her daughter as being a very sweet, non-aggressive girl who does not have trouble interacting with friends or family.  (Tr. at 446, 455).  Leslie's aunt, Mary DePina, also described Leslie as being a sweet girl.  (Tr. at 467).

## II.  STANDARD OF REVIEW

The SSA provides for judicial review of "any final decision of the Commissioner" in a disability proceeding.  42 U.S.C. § 405(g).  A reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).  Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla."  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 1995).

12

It "does not mean a large or considerable amount of evidence, but rather such relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (citation omitted). Not all evidence is considered "substantial." For instance,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support his ultimate conclusions. Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review." Jones, 364 F.3d at 503. As such, it does not matter if this Court "acting *de novo* might have reached a different conclusion" than the Commissioner. Monsour Med. Ctr. V. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). "The district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)). A Court must nevertheless "review the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984)). In doing so, the Court "must 'take into account whatever in the record fairly detracts from its weight.'" Id. (quoting Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)).

13

To properly review the findings of the ALJ, the court needs access to the ALJ's reasoning. Accordingly,

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)).  A court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record [her] reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The ALJ's findings should be "as comprehensive and as analytical as feasible, and, where appropriate, should  include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so a reviewing court may know the basis of those determinations."  Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981) (citing Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974)).  Such a requirement ensures that reviewing courts  are able to exercise their duty of review effectively and adequately.  Id.  While the ALJ must consider pertinent medical and non-medical evidence, and "explain conciliations and rejections," the ALJ is not required to discuss "every tidbit of evidence included in the record." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000).  If the ALJ fails to properly indicate why evidence was rejected, the court is not permitted to determine whether the evidence was discredited or simply ignored.  See Burnette, 220 F.3d at 121 (citations omitted).

## III.  APPLICABLE LAW

A claimant's eligibility for Social Security benefits is governed by 42 U.S.C. § 1382.  A

child under the age of 18 is considered disabled under the SSA if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).  The SSA has established a three-step process or determining whether a child is disabled. 20 C.F.R. § 416.924(a)-(d).

At step one, the Commissioner must determine whether the child is currently engaged in substantial gainful activity.  20 C.F.R § 416.924(b).  A person engages in substantial gainful activity when she participates in significant physical or mental activities for pay or profit.  20 C.F.R.§ 416.972 (a)-(b).  Generally, school attendance, taking care of oneself, and pursuing hobbies are not considered to be substantial gainful activity.  20 C.F.R. § 416.792(c).  If a child engages in substantial gainful activity, he or she is not disabled, and the analysis proceeds to the second step. 20 C.F.R. § 416.924(a).

The Commissioner, under step two, must determine whether the child suffers from a severe impairment or combination of impairments. 20 C.F.R.§ 416.920(c).  An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Id.  If a child does not have a severe medically determinable impairment or combination of impairments, he or she is not disabled.  If the Commissioner finds a severe impairment or combination of impairments, the analysis proceeds to step three.  20 C.F.R. § 416.924(a).

The analysis under step three requires a determination as to whether the child claimant's impairment meets, medically equals, or functionally equals the severity of an impairment listed in

15

20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 416.924(d).  Under the Regulations, an impairment "medically equals" a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).  An impairment "functionally equals" a listed impairment if the child has either "marked limitations"[3] in two of the following domains or "extreme limitations"[4] in one of the following domains:  (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.  20 C.F.R. §§ 416.926a(b)(1), 416.926a(d).  In assessing functional limitations, the SSA considers "all the relevant factors," including the effectiveness of the child's medication, the child's ability to function in school, and the effects of structured settings on the child's performance.  20 C.F.R. § 416.926a(a)(1)-(3).  If the child's disability meets, medically equals, or functionally equals a listed impairment, he or she will be considered disabled for the purposes of the SSA.  20 C.F.R. § 416.924(d)(1).

## IV.  ANALYSIS

On appeal, Plaintiff claims the ALJ did not properly consider evidence in the record, and challenges the ALJ's determination that her impairments were not functionally equivalent to the

---

[3]A "marked limitation" is an impairment that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2).  A "marked limitation" is one that is "more than moderate but less than extreme.  *Id*.  The SSA will find that a child has a "marked limitation" if his or her standardized test scores are "at least two, but less than three standard deviations below the mean."  *Id*.

[4]An "extreme limitation" is an impairment that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3). The "extreme limitation:" designation is reserved for impairments that are "more than marked," and is the rating the SSA gives "to the worst limitations."  *Id*.  The SSA will find that a child has an "extreme limitation" if his or her standardized test scores are at least three, standard deviations below the mean.  *Id*.

listings.  Pl.'s Br. 17.  Because of this error, Leslie claims the ALJ's determination should be reversed as a matter of law and the Court should award her SSI benefits.  Id.  She asserts that the ALJ failed to consider and properly analyze evidence that she has an extreme limitation in the "Moving About and Manipulating Objects" domain.  Id. at 18.  Leslie further claims that the ALJ failed to consider and properly analyze evidence that she has a marked limitation in the "Caring For Yourself" and  "Attending and Completing Tasks" domains.  Id. at 23, 28.

The Commissioner contends that the ALJ's decision should be affirmed because substantial evidence demonstrates that: Leslie had no limitation in the "Moving About and Manipulating Objects" domain; Leslie had no limitation in the "Caring for Yourself" domain; and Leslie had a less than marked limitation in the "Attending and Completing Tasks" domain.  Def.'s Br. 16-22

In this case, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 1, 2002, the alleged onset date.  (Tr. at 103).  Next, at step two, the ALJ found that Leslie has had severe impairments involving ADHD.  Id.  At step three, however, the ALJ found the Leslie is not disabled because she does not have an impairment or combination of impairments that meets, medically equals, or functionally equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id.

**A.  THE ALJ'S ALLEGED FAILURE TO EXPLAIN HIS RULING THAT LESLIE HAS NO LIMITATION IN THE "MOVING ABOUT AND MANIPULATING OBJECTS" DOMAIN**

Plaintiff argues that the ALJ's findings were not sufficient because he failed to explain why he attributed more weight to teachers' reports and parental testimony than to an October 2007 occupational therapy evaluation.  Pl.'s Br. 21-22.  Plaintiff claims that her under-developed fine

motor skills evidence an extreme limitation in this domain.[5]  Id. at 18.  In support of her claim, Plaintiff relies solely on an October 2007 occupational therapy evaluation by Susan Wisotcky, an occupational therapist at Leslie's school.  Id. at 19-23.  Plaintiff contends that substantial evidence in the record demonstrates that her limitations are extreme: She finds it difficult to use scissors and writing utensils; She exhibits global delays in visual perception skills that affect her eye hand coordination and may cause her to reverse certain letters; and she shows severe delays in graphomotor skills, which may affect her handwriting and copying skills.  Id. at 19-21.

Plaintiff's arguments are without merit.  In the Third Circuit, the ALJ must set forth the factual reasons supporting his decision.  Burnett, 220 F.3d at 119.  The "Moving About and Manipulating Objects" domain considers how well a child is able to move her body from one place to another (gross motor skills, which are not at issue) and how a child moves and manipulates objects (fine motor skills).  20 C.F.R. § 416.926a(j).  Fine motor skills involve: pushing, pulling, lifting, or carrying objects; transferring or holding objects; and manipulating small objects or parts of objects.  20 C.F.R. § 416.926a(j)(1)(ii).  To support his determination that Leslie had no limitation in the "Moving About and Manipulating Objects" domain, the ALJ referred to reports from Leslie's teacher, Ms. Labriola, to psychological reports from Leslie's doctors, and to Ms. Perdomo's testimony.  (Tr. at 39).

The ALJ provided an extensive summary of the factual record prior to making his individual findings.  (Tr. at 31-35).  In this summary, the ALJ made the following factual findings: Ms.

---

[5] Leslie does not argue that her gross motor skills are limited.  Indeed, evidence in the record suggests that she does not have limitations in moving her body from one place to another, balancing, walking, running, etc.

Labriola's 2005 and 2006 teacher reports showed that Leslie had no problem with moving about or manipulating objects; Dr. Morog's May 2006 report showed that Leslie had no limitation in moving about and manipulating objects; an initial evaluation made in January 2008 revealed that Leslie's motor activity was unremarkable; and Ms. Perdomo's testimony shows conflicting reports that Leslie both has nice handwriting and also cannot grab a pen or pencil properly.  Id.  The ALJ also referenced evidence contradicting his ultimate finding, in compliance with Cotter and Burnett: Leslie's October 2007 occupational therapy evaluation, which indicated that Leslie had weaknesses in visual perceptual and graphomotor skills.  Id. at 33.  Though the factual reasons supporting the determination that Leslie has no limitation in this domain may not be "as comprehensive and as analytical as feasible" in isolation, the preceding factual summary demonstrates that the ALJ carefully considered the entire record.  (Tr. at 31-35).  The factual reasons and summary, taken together, support a finding that substantial evidence exists which shows that Leslie has no limitation in this domain.

### B.   THE ALJ'S ALLEGED FAILURE TO EXPLAIN HIS RULING THAT LESLIE HAS NO LIMITATION IN THE "CARING FOR YOURSELF" DOMAIN

Plaintiff argues that, instead of thoroughly discussing the reasoning used to credit supporting evidence and indicating why other probative evidence was rejected, the ALJ simply wrote: "The claimant has no limitation in the ability to care for herself.  There is no evidence of limitation in this area."  Pl.'s Br. at 27.  Plaintiff cites  her fear of sleeping alone, her reliance on others to initiate homework, and her immature behavior as evidence of a marked limitation in this domain.  Id.  She further asserts that the ALJ did not adequately weigh her mother and aunt's testimony concerning her inappropriate behavior and sleep disturbances.  Id.

19

The ALJ is required to set forth the reasons for his decision. <u>Burnett</u>, 220 F.3d at 119 (citing <u>Cotter</u>, 642 F.2d at 704-05). While the ALJ is not required to use particular language or follow any specific formula, sufficient details must be provided to allow for meaningful judicial review. <u>Jones</u>, 364 F.3d at 505. The Third Circuit previously remanded an ALJ's determination that offered only that the Plaintiff's impairment "failed to equal the level of severity of any disabling condition" because such a conclusory statement provided the Court with no way of meaningfully reviewing the ALJ's "hopelessly inadequate" ruling. <u>Burnett</u>, 220 F.3d at 119-20. The ALJ's finding in the instant case that "[t]here is no evidence of limitation in this area" is not a conclusory statement because it followed a thorough review of the record in which the ALJ noted that Plaintiff uses the bathroom by herself, dresses herself and feeds herself. (Tr. at 33). Thus, the ALJ's determination is supported by substantial evidence.

## C.  THE ALJ'S ALLEGED FAILURE TO EXPLAIN HIS RULING THAT LESLIE HAS A LESS THAN MARKED LIMITATION IN THE "ATTENDING AND COMPLETING TASKS" DOMAIN

Finally, Plaintiff argues that the ALJ failed to properly explain his conclusion that she had a less than marked limitation in the "Attending and Completing Tasks" domain. Pl.'s Br. 28. She further argues that substantial evidence in the record shows that she has a marked limitation in this domain. <u>Id</u>. Specifically, Leslie argues that the ALJ failed to discuss his reasons for adopting evidence that Leslie performed better in school to the exclusion of contrary probative evidence on the record. <u>Id</u>. at 31. Leslie cites to her performance the 2007 WIAT and WISC-IV tests, teacher reports, and her mother's testimony as evidence that Leslie's hyperactivity and associated learning disabilities have not been sufficiently controlled by medication. <u>Id</u>.

The ALJ must provide "not only an expression of the evidence s/he considered which

20

supports the result, but also some indication of the evidence which was rejected." <u>Cotter</u>, 642 F.2d at 705.  Provision of such information aids the reviewing court in determining whether significant probative evidence "was not credited or simply ignored." <u>Id</u>.  Here, the ALJ properly discussed evidence supporting a finding that Leslie has a less than marked limitation in the "Attending and Completing Tasks" domain, but failed to discuss evidence in the record that contradicts reports that Leslie "could concentrate better and stay on task better" on medication.  Because such an omission makes it difficult for this Court to review the ruling, the Court vacates and remand the case for an explanation of reasoning supporting a determination that Leslie's "severe" impairment is not functionally equivalent to a listed impairment.  Since the ALJ has provided a fully developed record, on remand he need only explain his findings for this domain according to the requirements of 20 C.F.R. § 416.926a(h).

## V.  <u>CONCLUSION</u>

For the reasons stated, the final decision entered by ALJ De Steno is **affirmed** in part and **remanded** in part for further proceedings consistent with this opinion.  An appropriate order follows this opinion.

 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:          June   30  , 2011
Original:      Clerk's Office
cc:            All Counsel of Record